# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs July 27, 2010 at Knoxville

## STATE OF TENNESSEE v. BRODERICK JOSEPH SMITH

**Appeal from the Criminal Court for Davidson County**
**No. 2009-A-501     J. Randall Wyatt, Judge**

**No. M2009-01427-CCA-R3-CD - Filed January 14, 2011**

The Defendant, Broderick Joseph Smith, was convicted of two counts of carjacking, a Class B felony; three counts of attempted robbery, a Class D felony; one count of assault, a Class A misdemeanor; one count of aggravated robbery, a Class B felony; and one count of attempted carjacking, a Class C felony. The trial court sentenced the Defendant to 20 years on each of the carjacking convictions, eight years for each of the attempted robbery convictions, 11 months and 29 days for the assault conviction, 15 years for the aggravated robbery conviction, and ten years for the attempted carjacking conviction. The trial court ruled that the sentences for all but the assault conviction should run consecutively for an effective sentence of 89 years. The trial court also ruled that the sentence should run consecutively to the Defendant's sentence in federal court for two related armed bank robbery convictions. In this appeal as of right, the Defendant contends that (1) the trial court erred in denying his motion to dismiss on the ground that his right to a speedy trial had been violated; (2) that the trial court erred in denying his motion to sever the aggravated robbery count from the remainder of the indictment; (3) that the trial court erred in allowing the State to present evidence that the Defendant committed the two related armed bank robberies; and (4) that the trial court erred by imposing excessive sentences and by imposing consecutive sentences. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., J., joined. JOSEPH M. TIPTON, P.J., filed a separate concurring opinion.

Carol Dawn Deaner, District Public Defender; Jeffrey A. DeVasher, Assistant Public Defender (on appeal); and Joseph Michael Engle, Assistant Public Defender (at trial), attorneys for the appellant, Broderick Joseph Smith.

Robert E. Cooper, Jr., Attorney General and Reporter; Lindsy Paduch Stempel, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Amy Hunter Eisenbeck and Robert Homlar, Assistant District Attorneys General, attorneys for the appellee, State of Tennessee.

## OPINION

FACTUAL BACKGROUND

The Defendant, according to his statement to the police, needed money to buy a handgun because he was planning to kill his ex-girlfriend and her new boyfriend. The Defendant told the interviewing officers that "I knew in order for me to do it, I had to get some money, I had to get out of town [and] regroup, then I was going to come back." Once the Defendant returned to Nashville, he was going to go to the hospital where his ex-girlfriend and her boyfriend worked and "kill them mother f-----s" along with "who ever got in my way . . . ." The Defendant, in order to get the money he needed, robbed a gas station and two banks[1] on June 24 and 25, 2007. In addition to the robberies, the Defendant committed two carjackings, attempted a third carjacking, attempted to take the vehicles of three other people, and assaulted a man who tried to help one of the victims.

The Defendant was arrested on June 25, 2007, and indicted on October 26, 2007. A superseding indictment was issued on February 27, 2009. In between the original indictment and the superseding indictment, the Defendant pled guilty in federal court to two counts of armed bank robbery and had begun to serve his sentence. On March 2, 2009, the Defendant filed a motion to sever the aggravated robbery count from the remainder of the indictment. That same day, the State filed a notice of intent to use prior bad acts pursuant to Tennessee Rule of Evidence 404(b), specifically the Defendant's convictions for armed bank robbery in federal court. On March 4, 2009, the trial court issued an order denying the Defendant's motion to sever and allowing the State to present evidence of the Defendant's armed bank robbery convictions. However, the trial court ordered that any reference to the Defendant's attempts to obtain a handgun or his plan to murder his ex-girlfriend and her new boyfriend should be redacted from the Defendant's statement. Instead, the State was only permitted

---

[1]The Defendant subsequently pled guilty to two counts of armed bank robbery in the United States District Court for the Middle District of Tennessee and was sentenced to a term of 235 months in federal prison. The Defendant is currently serving his federal sentence.

to show that the Defendant committed the bank robberies in order to obtain money to purchase an item, but the State could not inform the jury what the item was. On March 6, 2009, the Defendant filed a motion to dismiss for lack of a speedy trial and the trial court denied the motion on March 9, 2009. The Defendant was tried on March 9 and 10, 2009, and was convicted by a jury of all counts.

At trial, the State presented evidence that the Defendant began his crime spree at the Adcock Shell station in Madison, Tennessee. The store clerk, Hyeju Sung, testified that the Defendant entered the gas station at approximately 2:00 p.m. on June 24, 2007. The Defendant walked around the store until all of the other customers left and then came to the cash register to buy a beer. When Ms. Sung opened the cash register, the Defendant grabbed her by her neck, put a pair of scissors up to her neck, and demanded money. Ms. Sung testified that she gave the Defendant all the money in the cash register, approximately $400, and he then left the gas station. Ms. Sung identified the Defendant as the robber and testified that she knew the Defendant because he had been a regular customer at the gas station for approximately one year. In addition to Ms. Sung's testimony, the State also introduced surveillance video taken from the gas station showing the Defendant committing the robbery.

That same evening around 10:00 p.m., Kathleen Runder stopped with her two children at a Shell gas station near Vanderbilt University. Ms. Runder testified that she and her family are from Little Rock, Arkansas and that they were visiting Nashville that day to celebrate her mother-in-law's birthday. Ms. Runder was driving her mother-in-law's minivan when she and her children stopped at the Shell station to buy snacks and drinks. Ms. Runder's children had gotten back into the minivan and Ms. Runder was sitting in the driver's seat with the door open when the Defendant approached her with a knife. Ms. Runder's children were able to get out of the minivan and run into the gas station. The Defendant pressed the knife against Ms. Runder's thigh and demanded that she give him the keys to the minivan. Ms. Runder agreed, and as she got out of the car, the Defendant grabbed her purse, got into the minivan, and drove away. Ms. Runder picked the Defendant's picture out of a photographic line-up and was able to identify the Defendant at trial as the person who carjacked her.

The next day at approximately 2:00 p.m., the Defendant drove the minivan he had taken from Ms. Runder to 525 Donelson Pike, Nashville where he proceeded to rob the Fifth-Third Bank. Within 20 minutes of this robbery the Defendant then drove the minivan to 1712 West End Avenue and robbed the Wachovia Bank located there. The Defendant then parked and abandoned Ms. Runder's minivan in the Baptist Hospital parking garage. Around 2:30 p.m., Anna Lisa Barnett entered the Baptist Hospital parking garage. She had just come from a doctor's appointment where she had been given a cortisone shot to her knee when the Defendant walked past her. Ms. Barnett testified that she turned around and saw the

Defendant coming back towards her and demanding her car keys. Ms. Barnett then "hobbled" towards her minivan, but when she got to the driver's side door, the Defendant had caught up to her and pulled out a knife. The Defendant again demanded her keys, and Ms. Barnett gave them to him. Ms. Barnett testified that the Defendant shouted "no, no, no" when he looked at Ms. Barnett's minivan and that it was nearly identical to the one he had taken from Ms. Runder. The Defendant tried to grab Ms. Barnett, and she began to crawl over the front of cars to get away from the Defendant.

The Defendant continued to chase Ms. Barnett until he saw Cecil Greene backing his truck into a parking space. Mr. Greene testified that after he had parked his truck, the driver's side door opened and the Defendant grabbed him by the left arm. The Defendant had his knife drawn back and demanded Mr. Greene's truck. Mr. Greene informed the Defendant he could not have the truck. Mr. Greene then asked his wife, who was seated in the passenger seat, to hand him his gun. The Defendant then ran back to Ms. Barnett's minivan and drove away. Mr. Greene testified at trial that he did not actually have a gun in his truck that day. Mr. Greene identified the Defendant as the man who attempted to carjack him. Ms. Barnett picked the Defendant's picture out of a photographic line-up, and identified him at trial as the person who stole her minivan.

The Defendant abandoned Ms. Barnett's minivan a few blocks away from the Baptist Hospital parking garage. The Defendant ran into an alley where he threw his pants, now covered in red dye from a dye pack in the money he had stolen from the banks, into a truck owned by James Reeves. Mr. Reeves testified at trial that he found pants in the back of his truck and when he moved them, he found a knife and a chain as well. After discarding his pants and his knife, the Defendant entered a FedEx delivery truck stopped in front of 2010 23rd Avenue North. The driver, Uere Hobson, testified that she was in the back of the truck when she felt someone enter the truck. She turned around, and the Defendant demanded that she give him the keys to the truck. Ms. Hobson demanded that the defendant get out of the truck. The Defendant then began to push Ms. Hobson towards the back of the truck. The Defendant looked away for a moment, and Ms. Hobson was able to get past him and out of the truck. Ms. Hobson ran towards the Lentz Health Center parking lot because she knew there would be other people there. The Defendant chased Ms. Hobson, and she called 911 on her cell phone. Ms. Hobson proceeded to run through the Lentz parking lot yelling for help and warning others to lock their doors.

Once in the Lentz Health Center parking lot, the Defendant jumped into the passenger side of Jostin Lear's car and demanded the keys. Mr. Lear tried to push the Defendant out of the car and refused to give him his keys. The Defendant then grabbed for Mr. Lear's keys, but Mr. Lear was able to hold onto the ignition key. Mr. Lear got out of his car and began to walk around to the passenger side of the car. At about the same time Mr. Lear got out of

his car, Dan Hedger, whose niece was parked next to Mr. Lear, came to assist Mr. Lear.  The Defendant got out of Mr. Lear's car and punched Mr. Hedger in the face opening a cut over Mr. Hedger's eye.  Mr. Hedger's niece, Bianca Tarantola, who was eight months pregnant at the time, had just secured her other child in a car seat when the Defendant got into the driver's seat of her car.  Ms. Tarantola quickly unbuckled her child and ran with her car keys. The Defendant chased after her, slammed her into a wall, and pinned her against the wall as he grabbed for her car keys.  The Defendant was eventually pulled off of Ms. Tarantola, and he began to walk away from the parking lot.[2]

Officer Ronnie Brock of the Metro Nashville Police Department was at the health center undergoing his yearly physical when he was alerted by employees that something was going on outside.  When Officer Brock stepped outside, he saw several people asking for help and pointing at the Defendant.  Officer Brock described the Defendant as appearing bloody and sweaty.  Officer Brock also testified that when he stepped outside of the center, the Defendant was walking away from the parking lot.  Officer Brock approached the Defendant and detained him after several witnesses stated that the Defendant had tried to rob them.  When Officer Brock arrested the Defendant, the Defendant was carrying a duffle bag containing a large amount of cash.  The Defendant was taken to General Hospital where he was read his <u>Miranda</u> rights, signed a rights waiver form, and gave a statement to the police. The Defendant presented no evidence and did not testify.

At the sentencing hearing, Ms. Runder testified that the Defendant had taken away her and her children's sense of safety.  She also testified that since the carjacking, both of her children had experienced anxiety and fear and that she and her children continued to go to counseling as a result of the carjacking.  Ms. Barnett testified that she had trouble going places by herself or with her children and that she had become paranoid about being in public since the carjacking.  She also testified that at the trial the Defendant waved at her, smiled at her, and taunted her.  The State argued that the following statutory enhancement factors applied to the Defendant:

> (1) the Defendant has a lengthy criminal history in addition to the prior convictions required to establish him as a Range II offender; (3) the offense involved more than one victim; (4) a victim of the offense was particularly vulnerable because of age or physical disability; (9) the Defendant employed a deadly weapon during the commission of the offense; (10) the

---

[2]Exactly how the Defendant was subdued is not clear from the testimony at trial.  Several of the witnesses claimed to have subdued the Defendant by themselves or that they detained the Defendant with the help of others until Officer Ronnie Brock arrived.

Defendant had no hesitation about committing a crime when the risk to human life was high; and (11) the felony involved the threat of death or serious bodily injury and the Defendant had previously been convicted of a felony that resulted in death or serious bodily injury.

Tenn. Code Ann. § 40-35-114. The State also requested consecutive sentences for the Defendant because

(1) the Defendant is a professional criminal; (2) the Defendant has an extensive history of criminal activity; and (4) the Defendant is a dangerous offender.

Tenn. Code Ann. § 40-35-115.

The Defendant responded to the State by suggesting that several mitigating factors applied to his case. The Defendant contended that he was acting under strong provocation because his relationship with his ex-girlfriend had just ended. The Defendant also contended that the "emotional trauma" from the end of his relationship coupled with a previous diagnosis of manic-depressive disorder reduced his culpability for the offenses. The Defendant also cited his medical history of heart disease, high blood pressure, and a bad back as a factor significantly reducing his culpability for the offenses. As an additional mitigating factor, the Defendant suggested that his actions at the Lentz Health Center were committed under such unusual circumstances that it was unlikely that an intent to violate the law motivated his conduct. Instead, the Defendant suggested that his "attempts to obtain transportation" were caused by his panic instead of an intent to commit the specific offenses. The Defendant also contended that his sentence in federal court reflected a significant enhancement based upon the actions that he was convicted for in state court and that the Defendant precipitated his own prosecution in state court by "demanding" that a detainer be filed. The Defendant also cited "new self-insight into his criminality" and explained his previous criminal history was caused by "a lack of marketable skills," his substance abuse, and the disruption of his life that his "cycles of incarceration" caused.

The trial court found that all of the enhancement factors offered by the State were applicable to the Defendant's case but decided to enhance the Defendant's sentence based solely on his "immense prior criminal history." The trial court gave no weight to any of the suggested mitigating factors offered by the Defendant. Based on this analysis, the trial court sentenced the Defendant to the maximum sentence for all of the convictions except for the aggravated robbery count. As for the manner of service, the trial court ordered the Defendant's sentences to run consecutively based upon his extensive criminal record and his

disregard for human life. The trial court sentenced the Defendant to a total effective sentence of 89 years and ordered his state sentence to run consecutively to his sentence in federal court for the two armed bank robberies.

## ANALYSIS

### I. Right to Speedy Trial

The Defendant contends that the trial court erred in denying his motion to dismiss for lack of a speedy trial. The Defendant contends that the 17-month delay between his indictment and his trial was caused by the State's bureaucratic negligence and that he timely asserted his right to a speedy trial when his counsel on the federal charges contacted the District Attorney General's office requesting "a prompt disposition" of the Defendant's state charges. Furthermore, the Defendant contends that he was prejudiced by this delay because he lost the opportunity to resolve this case in conjunction with the federal charges and that his mental condition had degraded while in federal prison. The State responds that the delay in this case was minimal and not unreasonable when compared to the period of delay in other cases. The State also responds that the Defendant did not assert his right to a speedy trial until March 6, 2009, three days before his trial. The State also argues that there is no evidence that the Defendant's mental condition had worsened during the delay and that the Defendant offered no proof as to how his defense was impaired by the delay.

Once the State initiates criminal proceedings, the right to a speedy trial is implicated pursuant to the Sixth Amendment to the United States Constitution and to article 1, section 9 of the Tennessee Constitution. See Tenn. Code Ann. § 40-14-101 (2006); Tenn. R. Crim. P. 48(b). The right is meant to protect the defendant "against oppressive pre-trial incarceration, the anxiety and concern due to unresolved criminal charges, and the risk that evidence will be lost or memories diminished." State v. Utley, 956 S.W.2d 489, 492 (Tenn. 1997). In Barker v. Wingo, 407 U.S. 514, 530 (1972), the Supreme Court devised a balancing test to determine speedy trial issues and identified the following factors for consideration:

(a) The length of delay;
(b) The reason for the delay;
(c) The defendant's assertion of his right to a speedy trial; and
(d) The prejudice to the defendant.

See also State v. Bishop, 493 S.W.2d 81, 84-85 (Tenn. 1973) (implicitly adopting the Barker balancing test for our State's constitutional and statutory right to a speedy trial). The balancing test adopted in Barker "necessarily compels courts to approach speedy trial cases

-7-

on an ad hoc basis." Barker, 407 U.S. at 530. The remedy for the denial of a speedy trial is dismissal of the charges. Strunk v. United States, 412 U.S. 434, 439 (1973).

The first Barker factor, length of delay, is a threshold factor, serving as the triggering mechanism "that will necessitate the consideration of the other three factors." State v. Wood, 924 S.W.2d 342, 346 (Tenn. 1996). Until the accused establishes a period of delay that is "presumptively prejudicial," there will be "no necessity for inquiry into the other factors that go into the balance." Barker, 407 U.S. at 530; see also State v. Easterly, 77 S.W.3d 226, 235-36 (Tenn. Crim. App. 2001). Generally, "a delay must approach one year to trigger the Barker v. Wingo analysis," although "the line of demarcation depends on the nature of the case." State v. Utley, 956 S.W.2d 489, 494 (Tenn. 1997); see Doggett v. United States, 505 U.S. 647, 652 n.1 (1992). The delay of one year and five months between the Defendant's indictment and his trial is enough to require inquiry into all of the Barker factors. We review a trial court's determination regarding a claim of a violation of the defendant's right to a speedy trial for abuse of discretion. Easterly, 77 S.W.3d at 236.

### A. Length of delay

The reasonableness of the length of the delay depends "upon the peculiar circumstances of each case." Easterly, 77 S.W.3d at 235. The delay "that can be tolerated for 'an ordinary street crime' is generally much less than for a serious, complex felony charge." Id. (citing Barker, 407 U.S. at 530-31). However, "the presumption that [the] delay has prejudiced the accused intensifies over time." State v. Simmons, 54 S.W.3d 755, 759 (Tenn. 2001). While the approximate 17-month delay between the Defendant's indictment and his trial is sufficient to trigger the full Barker analysis, "this period of delay is not necessarily unreasonable when compared to other cases." Id. (delay of 23 months); see also Doggett, 505 U.S. at 653 (delay of six years); Wood, 924 S.W.2d at 346 (delay of 13 years); Easterly, 77 S.W.3d at 236 (delay of 20 months). Additionally, "the delay is not egregious, given the fact" that the Defendant is charged with six felonies ranging from Class D to Class B. Easterly, 77 S.W.3d at 236 (delay of 20 months not egregious given the fact the defendant was charged with a Class A felony). Therefore, this factor weighs in favor of the State.

### B. Reason for delay

The next Barker factor to be considered, reason for the delay, generally falls into one of the following categories: "(1) intentional delay to gain a tactical advantage over the defense or delay designed to harass the defendant; (2) bureaucratic indifference or negligence; (3) delay necessary to the fair and effective prosecution of the case; and (4) delay caused, or acquiesced in, by the defense." Wood, 924 S.W.2d at 346-47. Intentional delay is "weighted heavily" against the State while "negligence or oversight are considered against

the [State] but afforded comparatively more neutral weight." Easterly, 77 S.W.3d at 236 (citing Barker, 407 U.S. at 531). There is nothing in the record to suggest that the delay in this case was intentionally caused by the State. Instead the trial court found that the delay was caused "because the Defendant was in federal custody and the two sovereigns were unable to facilitate his transfer to state custody."

Even though the delay was not intentional, this factor still weighs against the State "to some extent because a defendant has no duty to bring himself to trial." Simmons, 54 S.W.3d at 760 (quoting Barker, 407 U.S. at 527) (quotation marks omitted). While the factor weighs against the state, when the delay results from bureaucratic indifference, "the weight to be assigned this factor differs depending upon the length of the delay." Id. The court's tolerance of a delay caused by bureaucratic indifference "varies inversely with its protractedness and its consequent threat to the fairness of the accused's trial." Id. (quoting Doggett, 505 U.S. at 656). The delay in this case was not substantial and "did not greatly exceed the triggering threshold." Id. Therefore, "this factor does not weigh heavily against the State." Id.; accord Easterly, 77 S.W.3d at 237.

*C. Assertion of right*

The third factor in the Barker analysis is "the defendant's assertion or failure to assert the right to a speedy trial." Simmons, 54 S.W.3d at 760. A defendant's assertion of the right "is entitled to strong evidentiary weight in determining whether the right has been denied, and failure to assert the right will make it difficult to prove it was denied." Wood, 924 S.W.2d at 348. The defendant's failure to assert the right "implies [the] defendant does not actively seek a swift trial." Id. The Defendant cites this court's decision in Easterly for the proposition that a communication which does not contain an express demand for a speedy trial may nonetheless assert the right if "it is clear from the evidence that the tenor of [the] communication . . . was to that effect." Easterly, 77 S.W.3d at 237. While it is true that a defendant may assert his right to a speedy trial without an explicit demand, the facts in Easterly are markedly different from the facts of this case.

In Easterly, the defendant's counsel specifically requested that a capias be served on the defendant and "expressed concern [to the prosecutor] about prejudice as a result of the delay." 77 S.W.3d at 237. Here, the Defendant's counsel for his federal case did contact the prosecutor's office, but only "to see if we can reach a global settlement on all charges." The trial court found that Defendant's counsel never raised the importance of a speedy trial or actually requested that state proceedings be commenced against the Defendant. Instead, the communications were limited to requests for settlement negotiations and did not express a desire to expedite the state proceedings. Additionally, the communications did not express any concern for any possible prejudice that may have been caused by the delay. The

Defendant did not formally assert his right to a speedy trial until he filed his motion to dismiss on March 6, 2009, four days before trial. Therefore, this factor weighs in favor of the State.

## D. Prejudice

The final Barker factor is whether the accused suffered any prejudice as a result of the delay. Simmons, 54 S.W.3d at 760. This factor is the most important factor in the analysis and seeks to protect the following specific interests of the defendant: "(1) preventing oppressive pretrial incarceration; (2) minimizing the accused's anxiety and concern; and (3) limiting the possibility of impairment to preparation of the defense." Easterly, 77 S.W.3d at 237. Regarding the first interest, the trial court correctly found that there was no oppressive pretrial incarceration because during the delay, the Defendant was incarcerated for his federal armed robbery convictions and that he would have remained in federal custody even if there had been no state charges pending against him. Additionally, to the extent the Defendant claims that the delay prevented him from obtaining a plea bargain resolving both his state and federal charges, the mere possibility of obtaining a more favorable sentence "is not sufficient prejudice to establish a speedy trial violation . . . ." Simmons, 54 S.W.3d at 761. As for the Defendant's anxiety and concern, the Defendant presented no evidence in his motion to dismiss that the delay had increased his anxiety or concern. The Defendant did assert that the preparation of his defense was impaired by the delay. The Defendant claimed that the delay prevented him from preparing a mental health defense and hiring an expert on the issue. However, the trial court correctly found that the Defendant was aware of the state charges since his indictment in October 2007 and had nearly a year and half to prepare a mental health defense. Additionally, the Defendant presented no evidence that his mental condition had worsened during the delay. Because there is no evidence of any actual prejudice to the Defendant caused by the delay, this factor weighs in favor of the State.

## E. Balance of factors

The delay of 17 months between the Defendant's indictment and his trial was lengthy enough to trigger a Barker inquiry, but it was not unreasonable in view of the complexity of the case and the number of felony charges faced by the Defendant. There is nothing in the record to suggest that the delay was caused by anything other than bureaucratic indifference. Because the length of the delay was not protracted, this factor does not weigh heavily against the State. Additionally, we conclude that the Defendant did not timely assert his right to a speedy trial, and, most importantly, was not prejudiced by the delay. Accordingly, we hold that the trial court did not abuse its discretion in denying the Defendant's motion to dismiss for lack of a speedy trial.

*II. Severance of Offenses*

The Defendant contends that the trial court erred in denying his motion to sever the aggravated robbery count for the robbery of the gas station from the remainder of the indictment. The Defendant argues that the aggravated robbery offense was not part of a common scheme or plan related to the other charges in the indictment and that the evidence of the aggravated robbery would not be admissible at trial for the remaining counts of the indictment. The State responds that the aggravated robbery was part of a continuing plan by the Defendant to obtain the money needed to purchase a handgun. Alternatively, the State responds, even if the trial court erred in denying the motion to sever, the error was harmless.

The standard of review of a trial court's decision to consolidate or sever offenses is an abuse of discretion. State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999). An appellate court will not interfere with the exercise of this discretion unless it appears on the face of the record that the accused was prejudiced by the court's ruling. State v. Wiseman, 643 S.W.2d 354, 362 (Tenn. Crim. App. 1982). The decision to grant or deny a severance "depends upon the facts and circumstances involved in the various crimes that are charged." State v. Morris, 788 S.W.2d 820, 822 (Tenn. Crim. App. 1990).

Rule 8(b) of the Tennessee Rules of Criminal Procedure allows for the permissive joinder of offenses and states that "[t]wo or more offenses may be joined in the same indictment, presentment, or information, with each offense stated in a separate count, or consolidated pursuant to Rule 13 if the offenses constitute parts of a common scheme or plan or if they are of the same or similar character." Tenn. R. Crim. P. 8(b). However, Rule 14 of the Tennessee Rules of Criminal Procedure states that "[i]f two or more offenses have been joined or consolidated for trial . . . , the defendant shall have a right to a severance of the offenses unless the offenses are part of a common scheme or plan and the evidence of one would be admissible upon the trial of the others." Tenn. R. Crim. P. 14(b)(1) (emphasis added). Therefore, in order to deny a motion for severance the trial court must be satisfied in two findings: a common scheme or plan and the admissibility of evidence of one offense in a separate trial for the others. See State v. Hallock, 875 S.W.2d 285, 289 (Tenn. Crim. App. 1993); see also State v. Tolivar, 117 S.W.3d 216, 227-31 (Tenn. 2003).

The first prong of Rule 14(b)(1) of the Tennessee Rules of Criminal Procedure requires the trial court to find a common scheme or plan. In Tennessee, there are three categories of common scheme or plan evidence: (1) evidence showing a distinctive design or signature crime; (2) evidence demonstrating a larger, continuing plan or conspiracy; and (3) evidence that the offenses are part of the same transaction. State v. Moore, 6 S.W.3d 235, 240 (Tenn. 1999). For offenses to be considered part of a continuing plan or conspiracy, the crimes must be directed toward a "common goal or purpose." State v. Denton, 149 S.W.3d

1, 15 (Tenn. 2004) (quoting State v. Hoyt, 928 S.W.2d 935, 943 (Tenn. Crim. App. 1995)) (quotation marks omitted). Furthermore, this category "requires proof of 'a working plan, operating towards the future with such force as to make probable the crime for which the defendant is on trial.'" State v. Allen Prentice Blye, No. E2001-01375-CCA-R3-CD, 2002 WL 31487524, at *5 (Tenn. Crim. App. Nov. 1, 2002) (quoting Hoyt, 928 S.W.2d at 943), perm. app. denied (Tenn. March 10, 2003). The continuing plan or conspiracy category "has typically been restricted to cases involving crime sprees, where the defendant commits several crimes quite closely in time to one another." Id. (citing State v. Hall, 976 S.W.2d 121, 146 (Tenn. 1998) (appendix)). See generally Hall, 976 S.W.2d 146 (appendix) (concluding that joinder of trials for burglaries, larcenies, and murder proper where defendants committed offenses following escape from prison; larger plan was to flee the country and avoid capture); State v. William Arthur Shelton, No. E2005-02014-CCA-R3-CD, 2006 WL 3246100, at *4 (Tenn. Crim. App. Nov. 9, 2006) (concluding that joinder of kidnapping, vandalism, and murder trials proper where defendant detained occupants of a residence in an attempt to lure murder victim to the residence; defendant also vandalized car to prevent kidnapping victims from escaping), perm. app. denied (Tenn. 2007); State v. William Ramsey, No. M2001-02735-CCA-R3-CD, 2003 WL 21658589, at *9 (Tenn. Crim. App. July 15, 2003) (concluding that joinder of aggravated robbery and theft offenses occurring four months apart proper where defendant committed offenses in attempt to retaliate against victim, who had abused former codefendant's stepsister), perm. app. denied (Tenn. Dec. 22, 2003); State v. Mario Antoine Leggs, No. M2002-01022-CCA-R3-CD, 2003 WL 21189783, at *5 (Tenn. Crim. App. May 21, 2003) (concluding that joinder of multiple offenses including aggravated robbery, reckless aggravated assault, and theft proper where defendant, over a three-week period, stole several women's purses in the parking lot of a particular store at a particular mall; "offenses were part of a larger, continuing plan to steal women's purses" at that particular location), perm. app. denied (Tenn. Oct. 6, 2003).

The trial court in this case found that the aggravated robbery charge and the remaining charges in the indictment were part of the same common scheme or plan. The trial court, relying on the Defendant's statement to the police, found that all of the charges arose as part of the Defendant's plan to obtain money in order to purchase a handgun, "get out of town," and "regroup" before returning to Nashville to murder his ex-girlfriend, her new boyfriend, and anyone else who got in his way. The trial court also noted that all of these crimes occurred within a 25-hour time period, they were committed within a 15-mile radius of each other, and the longest break between crimes was nine hours. We conclude that the trial court did not abuse its discretion in finding that the aggravated robbery was part of a larger, continuing plan by the Defendant to obtain the money he needed for his plan to kill his ex-girlfriend and her new boyfriend.

-12-

The second prong of Rule 14(b)(1) of the Tennessee Rules of Criminal Procedure is what the Tennessee Supreme Court has deemed the "primary inquiry" in any severance case: whether the evidence of one offense would be admissible in the trial of the other if the two offenses remained severed. State v. Burchfield, 664 S.W.2d 284, 286 (Tenn. 1984). Our supreme court has stated that "'[u]nless [it is] expressly tied to a relevant issue, evidence of a common scheme or plan can only serve to encourage the jury to conclude that since the defendant committed the other crime, he also committed the crime charged.'" Moore, 6 S.W.3d at 239 n.5 (quoting Hallock, 875 S.W.2d at 292). The court has also stated that "a common scheme or plan for severance purposes is the same as a common scheme or plan for evidentiary purposes." Moore, 6 S.W.3d at 240 n.7. Therefore, Tennessee Rule of Evidence 404(b) is relevant to our analysis of this issue.

Rule 404(b) excludes evidence of "other crimes, wrongs, or acts" committed by the defendant when offered only to show the defendant's propensity to commit the crime charged. See Tenn. R. Evid. 404(b). Generally, evidence that the accused committed crimes independent of those for which he is on trial is inadmissible because such evidence lacks relevance and invites the finder of fact to infer guilt from propensity. See Moore, 6 S.W.3d at 239; see also Tenn. R. Evid. 404(b). Evidence of other crimes, wrongs, or acts, however, may be admissible for other purposes, such as "'to show identity, guilty knowledge, intent, motive, to rebut a defense of mistake or accident, or to establish some other relevant issue.'" Moore, 6 S.W.3d at 239 n. 5 (quoting Hallock, 875 S.W.2d at 292).

We agree with the trial court that evidence of the aggravated robbery would be admissible in the trial of the other offenses even if they were severed. The trial court found that evidence of the aggravated robbery would be important in establishing the Defendant's motive at a hypothetical separate trial for the remaining offenses. The trial court reasoned that the Defendant's motive for all of the charged crimes, to get money and leave town and regroup so the Defendant could kill his ex-girlfriend, preexisted the aggravated robbery charge and was the common thread running through the Defendant's crime spree. Additionally, we note, that evidence of the gas station robbery would be admissible in a separate trial for the remaining offenses in order to provide contextual background. Without evidence of the aggravated robbery, there would be no evidence that the Defendant tried to obtain any money.[3] Without evidence of the gas station robbery there would be a conceptual void in the State's case likely to result in significant jury confusion leaving the jury to consider a "seemingly haphazard crime spree across the area" with no apparent motive.

_____

[3]The trial court was correct in analyzing whether evidence of the gas station robbery would be admissible in a hypothetical separate trial for the other charges and then analyzing whether evidence of the bank robberies would be admissible at trial for all of the charges. Therefore, the trial court could not assume that the evidence of the bank robberies would be admitted at trial.

Following our review, we conclude that the trial court did not abuse its discretion in denying the pretrial motion for severance. Accordingly, we affirm the trial court's decision not to sever the aggravated robbery count from the remainder of the indictment.

### III. Evidence of Prior Bad Acts

The Defendant contends that the trial court erred by admitting evidence of the Defendant's federal convictions for two armed bank robberies. The Defendant argues that the evidence of his federal convictions does not satisfy any of the exceptions to the general rule that evidence of prior bad acts is inadmissible. The Defendant further contends that the evidence of his armed bank robbery convictions is not admissible as contextual background evidence because its absence would not have confused the jury or have created a chronological or conceptual void in the State's presentation of evidence. The State responds that the trial court did not err in admitting the evidence of the Defendant's federal convictions. The State argues that the Defendant's convictions were relevant to establish his motive for most of the charged crimes.

When evidence is proffered pursuant to Tennessee Rule of Evidence 404(b) and the record reflects that the trial court has substantially complied with the procedural requirements of that rule, the trial court's decision to admit or exclude evidence on the basis of Rule 404(b) will only be reversed upon a showing of an abuse of discretion. See State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997).

In State v. Gilliland, 22 S.W.3d 266 (Tenn. 2000), our supreme court discussed the admissibility of background evidence containing proof of prior bad acts of a defendant. The court noted that "in every case in which evidence of other crimes, wrongs, or acts is offered, the trial judge should carefully scrutinize the relevance of the evidence and reasons for which it is being offered." Gilliland, 22 S.W.3d at 271. Additionally, the court noted that

> evidence offered to show contextual background need not be excluded simply for the reason that it involves evidence of prior acts. If the contextual evidence is relevant to an issue other than criminal propensity and its probative value is not outweighed by the danger of unfair prejudice, then that evidence may be properly admissible.

Id. However, the court also warned that "general background evidence used to relate the full story of an offense is rarely probative of an actual issue at trial." Id. The court further stated that

[a] general policy that bars background evidence merely because it does not directly bear upon a material issue ignores the fact that such evidence is often crucial to understanding the other material evidence at trial, and the absence of background evidence could have detrimental effects on the jury's comprehension of the offense in question. <u>Events do not occur in a vacuum, and in many cases, knowledge of the events surrounding the commission of the crime may be necessary for the jury to "realistically evaluate the evidence."</u>

<u>Id.</u> at 271-272 (emphasis added) (citations omitted). In summary, the supreme court held that

when the state seeks to offer evidence of other crimes, wrongs, or acts that is relevant only to provide a contextual background for the case, the state must establish, and the trial court must find, that (1) the absence of the evidence would create a chronological or conceptual void in the state's presentation of its case; (2) the void created would likely result in significant jury confusion as to the material issues or evidence in the case; and (3) the probative value of the evidence is not outweighed by the danger of unfair prejudice.

<u>Id.</u> at 272.

Evidence of the two armed bank robberies committed by the Defendant provides a significant contextual background for this case. The absence of this evidence would have created a large void in the State's presentation of its case and would have likely resulted in significant jury confusion. Contrary to the Defendant's contentions on appeal, the evidence of his armed bank robbery convictions establishes a motive for all but one of the crimes he was convicted of. The Defendant carjacked Ms. Runder in order to obtain a vehicle to use in the bank robberies. Immediately following the bank robberies the Defendant carjacked Ms. Barnett, attempted to carjack Mr. Greene, accosted three other individuals and attempted to take their vehicles, and assaulted Mr. Hedger. All this was done in the Defendant's attempt to avoid arrest for the two armed bank robberies he had just committed. Without evidence of the bank robberies, the Defendant's actions would appear to be nothing more than random mayhem. Furthermore, there would be no connection between the robbery of the Shell gas station and the remaining charges of the indictment. Running through all of the charged offenses was the Defendant's plan to obtain the money he needed to make a purchase. Withholding the evidence of the bank robberies would have created a significant

chronological and conceptual void in the State's case resulting in significant jury confusion.

The probative value of this evidence outweighed the danger of unfair prejudice. The trial court limited the evidence's prejudicial effect by restricting the State to proving only that the two bank robberies occurred and that the Defendant was convicted of the bank robberies in federal court. The trial court did not allow the State to introduce the more prejudicial evidence of the Defendant's plan to kill his ex-girlfriend and her new boyfriend, or that the Defendant was trying to obtain money to purchase a gun. Instead, the State was only allowed to introduce to the jury the fact that the Defendant, in his statement to police, admitted to committing the robberies because he needed money to make a purchase. Accordingly, we conclude that the trial court did not err in admitting evidence of the Defendant's two federal convictions for armed robbery.

*IV. Sentencing*

The Defendant contends that the trial court erred in sentencing him to the maximum sentence in all but one of his convictions. The Defendant asserts that the trial court erred by failing to give any weight to the proposed mitigating factor that the Defendant's actions occurred "under such unusual circumstances" that an intent to violate the law did not motivate his conduct. The Defendant also contends that because of his age, the effective sentence of 89 years was not the least severe measure necessary to achieve the purposes of the 1989 Sentencing Reform Act and is greater than what is deserved for the offenses committed. Additionally, the Defendant contends that the trial court erred in imposing consecutive sentences on all of his felony convictions and ordering that his sentences be served consecutively to his current federal sentence. Again, the Defendant asserts that the trial court's sentence is greater than what is deserved for the offenses he committed. The State responds that the record fully supports the trial court's findings. The State notes that the Defendant has an extensive criminal history, including several convictions for violent offenses and that the trial court properly based the Defendant's sentence on this enhancement factor.

An appellate court's review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. Tenn. Code Ann. § 40-35-401(d). As the Sentencing Commission Comments to this section note, on appeal the burden is on the Defendant to show that the sentence is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, the court may not disturb the sentence even if a

different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991); see also State v. Carter, 254 S.W.3d 335 (Tenn. 2008).

However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In this respect, for the purpose of meaningful appellate review,

> [T]he trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence.

State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994) (citation omitted); see Tenn. Code Ann. § 40-35-210(e).

Tennessee's sentencing act provides:

(c) The court shall impose a sentence within the range of punishment, determined by whether the defendant is a mitigated, standard, persistent, career, or repeat violent offender. In imposing a specific sentence within the range of punishment, the court shall consider, but is not bound by, the following advisory sentencing guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c)(1)-(2).

The weight to be afforded an enhancement or mitigating factor is left to the trial court's discretion so long as its use complies with the purposes and principles of the 1989 Sentencing Act and the court's findings are adequately supported by the record. Id. § (d)-(f);

Carter, 254 S.W.3d at 342-43. Therefore, this court is "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in . . . the Sentencing Act." Carter, 254 S.W.3d at 346. As explained by our supreme court in Carter, the 2005 amendments to the Sentencing Act now afford the trial court such greater discretion that:

> the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of the [Sentencing Act].

Id. at 343 (citing Tenn. Code Ann. § 40-35-210(d)). Accordingly, on appeal we may only review whether the enhancement and mitigating factors were supported by the record and their application was not otherwise barred by statute. See id.

In conducting its de novo review, the appellate court must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf, (7) the defendant's potential for rehabilitation or treatment, and (8) any statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee. Tenn. Code Ann. §§ 40-35-102, -103, -210; see also Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229, 236-37 (Tenn. 1986).

We conclude that the record supports the trial court's sentencing decision. The trial court considered the enhancement factors presented by the State and the mitigating factors presented by the Defendant. The trial court chose to give great weight to the Defendant's "immense prior criminal history." As previously explained, as long as the record reflects that the trial court properly considered the principles of sentencing and facts and circumstances of the offense in arriving at its determination, this court is bound by the weight afforded any sentencing factors applicable to the offense. The Defendant contends he should not be criminally responsible for several of his convictions arising from his attempt to flee the scene of his two armed bank robberies. However, we note that the Defendant told police after his arrest that his plan was to leave town and "regroup" so he could come back, find his ex-girlfriend and her new boyfriend, and kill them. The Defendant's own statement belies any suggestion that his actions in the Baptist Hospital parking garage and the parking lot of the Lentz Health Center were done without any criminal intent. As for whether the Defendant's sentence was greater than what is deserved for the offenses committed, we note that the Defendant threatened serious bodily harm to several of his victims, that the Defendant assaulted Mr. Hedger when he intervened in the Defendant's attempt to take Mr. Lear's car,

and that the Defendant's entire course of action was motivated by his desire to murder two people along with anyone else who got in his way. Accordingly, we conclude that the sentences handed down by the trial court comply with the purposes and principles of the Sentencing Act and are affirmed.

Relative to the trial court's imposition of consecutive sentences, the trial court made specific findings that the Defendant qualified as an offender with an extensive history of criminal activity and as a dangerous offender. Tenn. Code Ann. § 40-35-115(b). The trial court noted the Defendant's extensive criminal history and his convictions for numerous felonies and misdemeanors. The Defendant's convictions include aggravated assault, rape, theft, driving under the influence, aggravated kidnapping, and aggravated robbery, among others. This court has consistently held that criminal history alone may serve as the basis for findings regarding the length and manner of service. State v. Meeks, 867 S.W.2d 361, 377 (Tenn. Crim. App. 1993). Additionally, we conclude that the effective sentence length of 89 years complies with the purposes and principles of the Sentencing Act. Accordingly, we affirm the trial court's imposition of consecutive sentences and its order that the Defendant's sentences be served consecutively to his current federal sentence.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE

-19-